IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TRAMMELL CROW RESIDENTIAL CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-2853-N |
| | § | |
| ST. PAUL FIRE AND MARINE | § | |
| INSURANCE COMPANY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# **ORDER**

This Order addresses Plaintiff Trammell Crow Residential Company's ("TCRC") motion for partial summary judgment [128] against Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). Because Texas law follows the "vertical exhaustion" doctrine and because, from the perspective of the insured, there was a single occurrence, the Court grants the motion.[1]

---

[1] This Order also addresses National Union's motions to strike portions of Scott Woodward's affidavit [143] and for leave to supplement its appendix [164] and TCRC's motions to strike National Union's exhibits [151] and for leave to file notice of supplemental authority [172]. The Court denies these motions as moot because the Court decides TCRC's motion for partial summary judgment without reference to the evidence at issue in these motions.

ORDER – PAGE 1

## I. FACTUAL BACKGROUND

TCRC is a large real estate firm that operates through a variety of affiliated companies.[2] In 1998 and 1999, TCRC affiliate Southampton Apartments, LLC ("SA") developed a multi-family housing project in South Carolina called "Southampton." Another TCRC affiliate was the general contractor. In August 2000, SA conveyed Southampton to Southampton Properties, LLC.

St. Paul Fire and Marine Insurance Company ("St. Paul") issued a commercial general liability ("CGL") policy to TCRC for February 5, 1999 through February 15, 2000.[3] The St. Paul CGL policy had limits of $1,000,000 per occurrence and $2,000,000 aggregate. General Accident Insurance Company of America n/k/a OneBeacon Insurance Company ("OneBeacon") issued a CGL policy to TCRC for February 15, 2000 through February 15, 2001. The OneBeacon CGL policy had the same limits as the St. Paul policy. National Union issued a $10 million umbrella policy to Trammell Crow Residential, Inc.[4] for the period from February 5, 1999 to February 5, 2000, and another $10 million umbrella policy

---

[2]The Court understands there are issues beyond the scope of the present motion regarding the relationship between TCRC and its affiliates. The Court does not intend to pass judgment on those issues in this Order by accidentally characterizing the related facts in any particular way.

[3]Although the cover page for the St. Paul policy indicates that it terminated on February 5, 2000, it apparently was extended for ten additional days. This unexplained discrepancy does not appear material to the present dispute, and the Court will not dwell on it any further.

[4]*See supra* note 2.

for the period from February 5, 2000 to February 15, 2001.[5] TCRC had other liability insurance before and after the February 5, 1999 to February 15, 2001 period.

In 2009, Southampton residents and the property owners association sued the TCRC affiliate developer and contractor (and other parties) alleging that defective construction caused water intrusion and damage to the premises (the "Southampton Litigation"). The TCRC affiliates eventually settled the Southampton Litigation for $3.435 million, funded as follows: (1) St. Paul paid $1 million; (2) OneBeacon paid $1 million; (3) TCRC paid $540,000 through another affiliate; (4) National Union paid $470,000; and (5) other parties paid the remaining $425,000. TCRC now seeks to recover the $540,000 it paid in settlement from National Union under one or both of its excess umbrella policies.

The instant motion deals with the question whether the underlying St. Paul and OneBeacon CGL policies are exhausted so that National Union's umbrella policies are in play. This raises two subissues: (1) is TCRC required to exhaust only the St. Paul and OneBeacon policies to get into National Union's umbrellas ("vertical exhaustion"), or is TCRC required also to exhaust the primary policies for other policy years that would potentially have coverage for the Southampton Litigation ("horizontal exhaustion"), and (2) was there a single occurrence or multiple occurrences.

---

[5]*See supra* note 3.

## II. APPLICABLE LEGAL STANDARDS

The standard for summary judgment is well-known, and the Court will not recap it here. *See, e.g.*, *House v. Interline Brands, Inc.*, 464 F. App'x 402, 404 (5th Cir. 2012) (unpub. per curiam).

The parties agree that Texas substantive law applies. Texas law regarding construction of insurance contracts is likewise well-known.

> In this diversity case, Texas rules of contract interpretation govern. *See Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir. 1996); *see also* TEX. INS. CODE ANN. art. 21.42 (1999). Under Texas law, the terms used in an insurance policy are to be given their ordinary and generally accepted meaning, unless there is an indication that the words were meant in a technical or different sense. *Canutillo*, 99 F.3d at 700 (citing *Security Mut. Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979)). The policy is to be considered as a whole, with each part given effect and meaning. *See id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)).
>
> It is well established under Texas law that ambiguities in insurance contracts are to be strictly construed against the insurer. *See Sharp v. State Farm Fire and Cas. Ins. Co.*, 115 F.3d 1258, 1260-61 (5th Cir. 1997) (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)). This is "'especially so when dealing with exceptions and words of limitation.'" *Lubbock County*, 143 F.3d at 242 (quoting *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 349 (Tex. 1976)). If a policy clause is ambiguous, the court must adopt the insured's construction of the clause, "'as long as that construction is not unreasonable, even if the construction urged by the insurer appears more reasonable or a more accurate reflection of the parties' intent.'" *Id.* (quoting *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).
>
> These rules favoring the insured apply only if the contract is determined to be ambiguous. *See Sharp*, 115 F.3d at 1261. Whether the contract is ambiguous is a question of law for the court to decide. *See id.* The fact that the parties disagree as to coverage does not create an ambiguity. *See id.* The court looks first to the language of the policy itself. *See id.* If the policy clause is susceptible of only one reasonable interpretation, the court must

> enforce the clause as written, *see Lubbock County*, 143 F.3d at 242, even if disfavorable to the insured.

*Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co.*, 197 F.3d 742, 746-47 (5th Cir. 1999); *accord Am. Int'l Spec. Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562-63 (5th Cir. 2010).

### III. TEXAS LAW REQUIRES VERTICAL EXHAUSTION

TCRC's position initially may appear inequitable. TCRC advocates letting the insured pick any applicable policy year and park the loss there, potentially exhausting that year's primary coverage and "spiking" up into an excess layer. When the damage occurred over several policy years, this initially appears to saddle one unlucky year's carriers with a disproportionate share of the loss. On closer examination, however, that is not the case. An insurer who pays a disproportionate share of the loss simply assumes the burden of seeking recovery from other available policies. In the absence of vertical exhaustion, the burden to seek recovery from all potentially applicable policies would rest on the insured. From this perspective, the choice between vertical and horizontal exhaustion is one of which side should bear the burden of seeking contribution from other insurers – the insured or the carrier. It does not seem inequitable to place this administrative burden (and associated risks) on the carrier rather than the insured.

Having said that, the Court holds that Texas law, specifically *American Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842 (Tex. 1994), requires vertical exhaustion, for the reasons given by Judge Folsom in *LSG Techs., Inc. v. United States Fire Ins. Co.*, 2010 WL 5646054, at *10-13 (E.D. Tex. 2010).

National Union makes two additional arguments the Court must address. First, National Union argues that the specific language of the 2000-01 policy requires horizontal exhaustion. That policy provides that it does not apply "unless and until 1. under Coverage A, the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss." TCRC App. 431. "Scheduled Underlying Insurance" is defined as the listed underlying insurance policy *and* "automatically any renewal or replacement of any [listed policy], provided that such renewal or replacement provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced." *Id.* at 419. National Union argues that TCRC renewed or replaced its primary coverage for years after the years in question. It thus argues from the literal language that TCRC must exhaust all of those primary policies.

This argument proves too much. It would require exhaustion of not only the primary coverage for the same policy year, but also all subsequent years' primary coverage. That would radically change the parties' bargain. Moreover, there is a reasonable alternative construction: underlying insurance means the listed policy and automatically any renewal or replacement of the listed policy during the term of the excess policy. This construction would address the circumstance of the excess policy having a different term than the primary policy. It also would address the circumstance of the original primary policy lapsing for some reason during the term and getting replaced. Under either of those circumstances, if the excess policy required exhaustion of only the listed original primary policy and that policy had lapsed or been renewed, National Union could find itself as a co-primary insurer,

rather than excess. Because this alternate construction is reasonable and favors coverage, the Court must adopt that construction. *See Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

Second, National Union argues that there might be other primary coverage. It points to some of the construction contracts that required subcontractors to name TCRC affiliates as additional insureds. But National Union does not point to any actual policies that insure TCRC affiliates. It is insufficient for National Union to resist summary judgment based on hypothetical other insurance. National Union would bear the burden of proving the existence of other insurance at trial and thus has the burden at summary judgment to come forward with any concrete evidence of any such policy. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 329 (1986). It has failed to carry that burden.

The Court thus holds that TCRC must establish only that it has exhausted the St. Paul and OneBeacon primary policies.

## IV. THERE WAS A SINGLE OCCURRENCE

Both the St. Paul and OneBeacon policies provide limits of $1 million per occurrence and $2 million aggregate. Each carrier paid $1 million in settlement of the Southampton Litigation. Thus, if there was one occurrence, their policy limits are exhausted; conversely, if there was more than one occurrence, their policy limits are not exhausted.

The St. Paul policy speaks in terms of an "event," rather than an occurrence. It defines an event as "an accident, including continuous or repeated exposure to substantially

ORDER – PAGE 7

the same general harmful conditions." TCRC App. 140. The OneBeacon policy uses the identical definition of occurrence. *Id.* 320.

National Union relies primarily on *U.E. Texas One-Barrington Ltd. v. General Star Indem. Co.*, 332 F.3d 274 (5th Cir. 2003). Texas One owned an apartment complex consisting of thirty residential buildings, three office buildings, and other facilities. *Id.* at 276. Several of the buildings suffered foundation movement and above-ground damage resulting from moisture changes in the soil beneath the foundations. *Id.* The parties disputed the cause of the moisture change, but found plumbing leaks in many of the buildings. *Id.* "The parties also stipulated that the leaks under any particular building foundation at the property only affected the foundation of that particular building and did not contribute to the movement of any other building foundation at the property nor did they cause any other plumbing leaks." *Id.*[6]

Texas One sued its property insurer and excess insurer for damage caused by the plumbing leaks. The issue with the excess carrier turned on how many occurrences (and thus how many deductibles) there were. The district court found one occurrence per building, and the Fifth Circuit affirmed. "Under Texas law, 'the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on

---

[6]This essentially amounted to a factual stipulation of multiple occurrences. There is no corresponding stipulation in this case. Indeed, the Court is not aware of any party in this case even making a similar factual contention regarding the source of the water intrusion into the Southampton project.

ORDER – PAGE 8

the number of injurious effects.'" *Id.* at 277 (quoting *Ran-Nan Inc. v. General Accident Ins. Co.*, 252 F.3d 738, 739 (5th Cir. 2001) (per curiam)).

> Thus, in determining the number of "occurrences" under the Fireman's Fund policy, we should not focus on the alleged overarching cause, but rather on the specific event that caused the loss. In this case the losses arose when the pipes broke, not when they were installed. The parties have stipulated that a different leak was responsible for the damage to each building, and as such we agree with the district court that each leak constitutes a separate occurrence as a matter of law.

*Id.* at 278.

The *Texas One* dissent argued that Texas law uses a different test for occurrence in liability policies than in property policies. *Id.* at 279. The majority rejected that view: "Even if the dissent's policy arguments are correct, however, this court has already rejected any such distinction." *Id.* at 277 n.2 (quoting *Ran-Nan*, 252 F.3d at 740). This Court is of course bound by the Fifth Circuit and will apply the same legal occurrence test here used in *Texas One* – the events that cause the injuries and give rise to the insured's liability. Having said that, the Court must acknowledge that, factually, the type of events that give rise to an insured's liability in a liability policy are qualitatively different than the events that cause the injuries in a property policy.

It is tempting to see the faulty construction of the buildings as the cause of the injury. That would be analogous to the installation of the plumbing in *Texas One*, though, and too overarching to be considered the cause. Moreover, at the time of the construction, the underlying plaintiffs in the Southampton Litigation would have had no claim against the TCRC affiliates because they did not then own the property.

The Court holds that the event giving rise to the insured's liability here was the sale of the property. The buildings were at that time defectively constructed, even if the defects were latent and the damage had not manifested. *Cf. Don's Building Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.2d 20, 24-30 (Tex. 2008) (property damage occurred when injury occurred, even if latent and not manifested); *Houston Waterworks Co. v. Kennedy*, 70 Tex. 233 235-36 (1888) (cause of action for improper cutting of arch on plaintiff's property occurred at time of cutting, not later when damage to property manifested).

This is consistent with *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204 (5th Cir. 1971). Pincoffs imported a large quantity of contaminated canary seed, which it then sold to eight feed and grain dealers. Those dealers in turn sold the seed to bird owners; many of the birds died. The bird owners made claims against the dealers who in turn made claims against Pincoffs. *Id.* at 205. The district court found a single occurrence when the seed was contaminated. The Fifth Circuit reversed:

> We think that the "occurrence" to which the policy must refer is the occurrence of the events or incidents for which Pincoffs is liable. It was the sale of the contaminated seed for which Pincoffs was liable. Although the cause of the contamination is not clear, it seems apparent that Pincoffs received the seed in a contaminated condition and did not itself contaminate the seed. However, it was not the act of contamination which subjected Pincoffs to liability. If Pincoffs had destroyed the seed before sale, for instance, there would be no occurrence at all for which the insured would be liable. But once a sale was made there would be liability for any resulting damages. It was the sale that created the exposure to "a condition which resulted in property damage neither expected nor intended from the standpoint of the insured," under the definition of the policy. And for each of the eight sales made by Pincoffs, there was a new exposure and another occurrence.

*Id.* at 206 (citing *O.M. Franklin Serum Co. v. C.A. Hoover & Son*, 410 S.W.2d 272 (Tex. Civ. App. – Amarillo 1966, writ ref. n.r.e.)).  Significantly, the Court did not hold that there was a separate occurrence each time a canary met its demise.  By analogy, here there was not a separate occurrence each time a building sprang a leak.  The sole occurrence for which the insureds are liable was the sale of the property.

## CONCLUSION

Because the Court holds that Texas law provides for vertical exhaustion and that there was a single occurrence, the Court grants TCRC's motion for partial summary judgment on National Union's exhaustion defense.

Signed January 21, 2014.

_____
David C. Godbey
United States District Judge